* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * RULING ON EVIDENTIARY MATTER
Plaintiff made a motion to admit a document into evidence during oral arguments before the Full Commission. Defendants objected. The Full Commission herein sustains Defendants' objection.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 * * * * * * * * * * * STIPULATIONS
1. On September 21, 2000, an Employee-Employer relationship existed between Plaintiff and Law Companies Group, Inc. On that date, Zurich American Insurance Company was the carrier on the risk.
2. On September 21, 2000, Plaintiff suffered a compensable injury to her back as a result of a motor vehicle accident occurring in the course and scope of her employment with Defendant-Employer.
3. Plaintiff's average weekly wage is $547.71, yielding a compensation rate of $365.15.
4. The carrier submitted an Industrial Commission Form 63 and Plaintiff has been paid temporary total disability benefits at the rate of $365.15 per week from September 22, 2000 to date [of stipulations] and continuing.
5. The parties agree that all Industrial Commission forms may be received into evidence.
6. The parties stipulated to the following documents:
a. All Industrial Commission Forms.
b. All Plaintiff's Medical Records.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The primary issue before the Commission is whether Plaintiff's temporary total disability benefits should be terminated effective December 2001, on the ground that Plaintiff did not have any continuing disability due to her workplace injury after that date.
2. At the time of the hearing before the Deputy Commissioner, Plaintiff was thirty-eight years of age, having been born on January 24, 1965. Plaintiff attended high school and later obtained a GED. Plaintiff continued her education at Wake Technical Community College located in Raleigh, North Carolina, where she completed courses in upholstery and cosmetology, and received her Certified Nursing Assistant certification. Plaintiff is also fluent in the Spanish language.
3. In June 1999, Plaintiff was hired as a soil technician with Defendant-Employer. As a soil technician, Plaintiff extracted, carried, and tested five-pound soil samples for load bearing capabilities, and lifted and tested twenty-pound concrete cylinder molds.
4. On September 21, 2000, Plaintiff sustained injuries to her back, chest and legs as a result of a motor vehicle accident while working for Defendant-Employer. On the same date, Plaintiff received medical treatment at Johnston Memorial Hospital. Physician Assistant David Baker treated her for complaints of back and chest pain. Plaintiff was diagnosed with strain of the lumbar area and contusions of the chest, and prescribed Ultram for pain. Plaintiff was instructed to apply moist heat to her chest and back and was referred to Dr. Russell Anderson for further evaluation.
5. On September 26, 2000, Plaintiff presented to Rex Hospital with complaints of neck, back, and chest pain. On physical examination, Dr. Robert J. Denton, an emergency room physician, noted that Plaintiff exhibited diffuse paracervical tenderness to palpation, and diffuse paralumbar tenderness to palpation with no palpable muscle spasm. Plaintiff had no extremity swelling or deformities with full range of motion of all joints. Plaintiff was instructed to rest, apply moist heat to her chest and back and discontinue the use of Ultram. She was prescribed Ibuprofen 600 mg and Vicodin 5 mg and told to follow-up with the orthopedic physician on call if her symptoms lasted longer than one week.
6. On September 29, 2000, Plaintiff began treatment for back and leg pain with Dr. Sarah E. DeWitt, an orthopaedic specialist. Dr. DeWitt diagnosed Plaintiff with acute back strain and prescribed physical therapy and medication.
7. Dr. DeWitt continued to treat Plaintiff conservatively with pain medication and intermittent physical therapy. Dr. Dewitt also arranged for coordination of various diagnostic testing with neurologists. Dr. DeWitt opined that Plaintiff's acute back pain was directly related to her September 21, 2000 automobile accident. Dr. DeWitt referred Plaintiff to Dr. Paul B. Suh for a neurological evaluation.
8. On October 9, 2000, Defendants filed a Form 63, agreeing to pay compensation to Plaintiff without prejudice. Defendants did not contest compensability or its liability for the claim within the time period allowed by statute.
9. On December 7, 2000, Dr. Suh examined Plaintiff and recommended a cervical and lumbar MRI. On January 4, 2001, Dr. Suh recommended that Plaintiff undergo lower extremity nerve conduction studies. On January 11, 2001, Dr. Suh reviewed the MRI and nerve conduction study results, recommended that Plaintiff not undergo surgery, and referred Plaintiff to a pain clinic for pain management. Dr. Suh noted that it did not appear Plaintiff needed work restrictions and he did not assign work restrictions or a permanent partial disability rating.
10. On February 9, 2001, Plaintiff began treatment with Dr. Daphne C. McKee, a licensed psychologist, for determination of whether participation in the North Carolina Spine Center's Behavioral Medicine Pain Management Program would be beneficial. Dr. McKee observed that Plaintiff walked to the interview room with a great deal of difficulty. Plaintiff had a pronounced limp and moved very slowly with her left leg rotated outward. Dr. McKee also observed that Plaintiff held onto the walls as she walked to the interview room. At the interview, Plaintiff told Dr. McKee that she could only walk fifteen to twenty minutes before she has to sit down and that she could no longer engage in most of her daily activities. Dr. McKee indicated that it would be difficult to determine whether Plaintiff would benefit from pain and stress management training, but since Plaintiff was willing to try, Dr. McKee scheduled her for a series of one-hour sessions. He noted that Plaintiff was being treated for depression by a psychiatrist who also prescribed Celebrex. Plaintiff had follow-up visits with Dr. McKee on February 20, 2001, March 8, 2001, March 22, 2001, and May 1, 2001.
11. On October 25 and 26, 2001, December 29, 2001, January 9, 10, and 11, 2002, and May 10, 2002, a private investigator with Regional Investigative Services Company conducted surveillances of Plaintiff's daily activities. The private investigator admitted that he mistakenly identified Doretha Branch, Plaintiff's roommate, as Plaintiff in one set of his videotapes.
12. On October 25, 2001 at 2:45 p.m., Plaintiff was shown on videotape sweeping the front porch for a few minutes, then sitting for a few minutes. On October 26, 2001, only Plaintiff's roommate appeared on the video surveillance. The October 26, 2001 surveillance videotape consisted of approximately twenty minutes of coverage, and Plaintiff's roommate was shown walking swiftly and fluidly. On December 29, 2001, Plaintiff was shown driving a white rental car. Plaintiff was also shown walking into and out of a check-cashing store. On January 10, 2002 at 6:43 p.m., Plaintiff rode to a Harris Teeter grocery store with her roommate, who was driving. Plaintiff had a very noticeable limp when shown walking to and from the store. On May 10, 2002 at 1:30 p.m., Plaintiff was shown walking into Raleigh Orthopaedic Clinic. Later that day she was shown being picked-up from the clinic by her roommate. Plaintiff was shown limping and walking slowly while coming from the clinic.
13. As to the photograph of January 11, 2002 at 7:11 p.m., the investigator specifically noted that the person depicted (who was Plaintiff) appears to have considerable difficulty walking.
14. Plaintiff testified that she could stand for short periods of time, she was not steady on her feet and her coordination was off. Plaintiff described a short period of time as fifteen minutes on a bad day and thirty minutes on a good day.
15. Although Plaintiff treated with numerous physicians and has had numerous diagnostic tests related to her injury, only Dr. Steven Olson and Dr. Catherine Lawrence were deposed.
16. On November 13, 2001, Dr. Catherine Lawrence, a doctor of osteopathic medicine at the Carolina Back Institute, evaluated Plaintiff. Dr. Lawrence is a board certified physiatrist specializing in physical medicine, rehabilitation and pain management. Dr. Lawrence recommended that Plaintiff enroll in Carolina Back Institute's pain management program. Dr. Lawrence gave Plaintiff work restrictions and medications for pain management.
17. Prior to September 21, 2000, Plaintiff was involved in a motor vehicle accident in 1988, where she sustained bilateral femur fractures and had rods inserted in both legs. On February 10, 2002, Plaintiff was treated at Rex Healthcare for pain in the right knee and leg. Her x-rays taken on that date showed a fracture in the intermedullary rod in the right femur.
18. Plaintiff was using a cane to assist her with walking when Dr. Lawrence initially evaluated her on November 13, 2001. Plaintiff was not using a cane in the still photographs and videos taken six to eight weeks later on December 29, 2001 and January 2002. Progress notes from Carolina Back Institute detailing Plaintiff's progress from January 14, 2002 through February 7, 2002, indicate that Plaintiff could walk during the early stages of her treatment 150 ft. to 200 ft. and by the end 600 ft. without assistance. Plaintiff's activities as depicted in the still photographs and videotapes were not inconsistent with her demonstrated ability at the Carolina Back Institute.
19. At her deposition on April 10, 2003, Dr. Lawrence opined that Plaintiff had chronic pain syndrome, which she defined as pain that persisted beyond the normal healing time after an injury. She also opined that Plaintiff had a break in the intramedullary rod at the proximal interlock aspect of the right femur. This positioning is close to the upper hip. Dr. Lawrence testified that "a motor vehicle accident can certainly cause a break in a rod," and that a broken rod can cause pain. She testified, however, that she could not be certain that the accident caused the break in the rod without first seeing an x-ray of Plaintiff's right femur taken prior to September 21, 2000. Dr. Lawrence noted September 21, 2000, as the date of onset of Plaintiff's right leg pain.
20. Dr. Lawrence testified that when you a have a break in a rod, which is situated within a bone, the break tends to destabilize the functioning of the bone in terms of capacity to bear weight. Dr. Lawrence concluded that Plaintiff could perform most activities despite having a broken intermedullary rod in the femur, even though she may still have pain. Although Dr. Lawrence concluded that Plaintiff could be expected to have pain from the broken intermedullary rod in the femur, she conceded that the severity of pain cannot be measured and is only assessed subjectively from the viewpoint of the patient.
21. After Plaintiff's participation in and completion of the pain management program, Dr. Lawrence initially assigned Plaintiff a five percent permanency rating to both the left and right legs. However, on March 7, 2002, Dr. Lawrence retracted her ratings to the legs and assigned Plaintiff a five percent permanency rating to the back.
22. Dr. Lawrence was asked to view a videotape of a person identified as the Plaintiff. Dr. Lawrence could not conclusively identify the person depicted in the videotape as Plaintiff. She wrote a letter to Defendants on March 7, 2002, stating:
 I was asked to review the videotape of a woman who you claim to be Zoraida Williams. You stated to me that there has been a positive identification that the video does in fact show the activities of Ms. Williams. I am not an expert in the field of private investigation, nor do I have any resources to say whether or not the person in the videotape is indeed her; however, I feel confident in saying that if the persona [sic] in the videotape is indeed her, she has absolutely no gait impairment whatsoever, and would have been given an impairment rating of 0% of the back as well as the lower extremities. Again, if indeed the person in the videotape is Ms. Williams, she would have no work restrictions.
23. Throughout her deposition testimony, Dr. Lawrence expressed doubt that the person in the pictures and videotapes shown to her was Plaintiff. At one point, Dr. Lawrence stated, "I'm not convinced that that is [Plaintiff]." Defendant responded, "[W]ell, I asked you to assume that, did I not." Defendant's private investigator admitted to mistakenly identifying the wrong person as Plaintiff in at least one of his video surveillances.
24. As of February 11, 2002, Dr. Lawrence and the Carolina Back Institute released Plaintiff to return to work with restrictions of no lifting and restrictions on pulling, pushing, walking, standing, squatting, kneeling, bending and use of her lower extremities. Plaintiff was prescribed pain medication and advised to practice relaxation techniques and continue a home exercise program. Based upon the February 17, 2002 letter from Betty Jo Johnson, Program Coordinator of Carolina Back Institute's pain management program, Defendant-Employer did not appear able to accommodate Plaintiff's restrictions. The Carolina Back Institute report also stated that Plaintiff required vocational services if Defendant-Employer was unable to provide employment. Dr. Sarah E. Dewitt of Raleigh Orthopedic Clinic had previously noted on May 4, 2001 that vocational rehabilitation would be the best option for Plaintiff and would certainly be a therapeutic benefit.
25. The Full Commission gives no weight to Dr. Lawrence's conditional opinion that if the person in the videotape is Plaintiff, she would have no work restrictions and an impairment rating of zero percent, due to Dr. Lawrence's stated doubt and confusion about whether the person depicted on the videotape was Plaintiff and other evidence indicating that Dr. Lawrence was given videotape footage of several people who were not Plaintiff and who had no noticeable gait impairment. Even though Defendants referenced specifically dated still photos and videotapes of the Plaintiff in their questioning of Dr. Lawrence during the deposition, Dr. Lawrence was not shown the specific videotape about which she was asked to render her opinion at the deposition, and asked to give her opinion after Plaintiff was identified. On the December 29, 2001 videotape, Plaintiff was shown walking short distances and did not have a pronounced limp. The January 10, 2002 videotape showed Plaintiff's roommate and another person other than Plaintiff, except for about five seconds when a person that appeared to be Plaintiff stood on the porch and then re-entered the house. Upon review of all the videotapes and still photographs presented, the Full Commission agrees that some of the persons depicted on the videotapes walked without a limp and demonstrated no observable impairments; however, these persons were not Plaintiff. Plaintiff did walk with a noticeable limp on all of the videotapes except on December 29, 2001 where she was shown walking for a brief period with some observable leg stiffness but not a limp. Dr. Lawrence's testimony and her correspondence with Defendants indicate only that if the person depicted in the videotape was Plaintiff, then Plaintiff has no impairment. The January 11, 2002 videotape showed an unidentified female walking swiftly to and from Plaintiff's house, Plaintiff's roommate walking swiftly to and from Plaintiff's home several times and a young unidentified male wearing his hair braided walking to and from Plaintiff's home and standing outside for a brief period on one occasion. Plaintiff exited the house with her roommate around 6:00 p.m., rode to Harris Teeter and was shown walking with very noticeable leg stiffness and a limp.
26. On or about June 24, 2002, Defendants filed a Form 33, request for hearing, asserting that Plaintiff was no longer entitled to temporary total disability benefits.
27. On August 13, 2003, Plaintiff began treatment with Dr. Steven Olson, an orthopedic surgeon. Dr. Olson was deposed on May 6, 2004. Dr. Olson found that Plaintiff had a noticeable difference in leg length, which could be contributing to her leg pain. Dr. Olson took an x-ray of Plaintiff's legs, which showed that the right femoral rod was broken.
28. Dr. Olson was unsure of why or how the rod became broken. Dr. Olson opined that it was unlikely Plaintiff had fractured the rod in her right femur during the motor vehicle accident of September 21, 2000, based on the absence of evidence of a recent fracture to the right femur. Dr. Olson also thought it unlikely that the September 21, 2000 accident would have been significant enough to break the rod, which is situated in the bone, and not break the bone itself. Dr. Olson speculated that the rod could have broken many years earlier, quite probably during Plaintiff's rehabilitation following her motor vehicle accident in 1988, but he testified that he really did not know.
29. Dr. Olson testified that hardware pain is hard to quantify. He had no idea whether the broken rod was causing the pain and in his opinion the only way to know was to take the rod out to see if it helps; but that would not be the first option he would recommend. In a letter dated November 3, 2003, Dr. Olson stated that Plaintiff's September 21, 2000 motor vehicle accident did not substantially aggravate Plaintiff's current leg problems. He also stated that he could give no reason as to why Plaintiff's accident should have precipitated Plaintiff's pain. However, when provided during deposition a copy of a report of a CT scan done April 21, 2004, at Bellevue Hospital and a March 4, 2004 clinic note from Bellevue Hospital wherein the doctor noted that Plaintiff's right thigh pain was likely due to loose or failed hardware, Dr. Olson testified, "I think it is possible but not probable that her thigh pain is caused by this [rod]. It's within the realm of possibility, but I'm not more than 50 percent sure that it is."
30. Dr. Olson was of the opinion that Plaintiff could lift up to ten pounds frequently, twenty pounds intermittently, and occasionally sit eight hours a day with frequent breaks, stand and walk occasionally and do sedentary work.
31. The Full Commission finds that Plaintiff's chronic pain syndrome and the pain in her legs were caused by Plaintiff's motor vehicle accident on September 21, 2000. Specifically, both Dr. Lawrence and Dr. Olson noted that Plaintiff's onset of leg pain began approximately September 21, 2000, and both testified that a motor vehicle accident could have caused the rod to break in Plaintiff's right leg; even though Dr. Olson was of the opinion that it is unlikely the accident caused the rod to break without fracturing the bone itself.
32. The Full Commission gives greater weight to the opinions of Dr. Lawrence versus the opinions of Dr. Olson; however, the Full Commission gives no weight to Dr. Lawrence's conditional opinion that if the person depicted in the videotape was Plaintiff, then Plaintiff has no impairment.
33. On September 21, 2000, Plaintiff sustained compensable injuries to her back, chest and legs, and suffers from chronic leg pain as a result of her compensable injury. As a result of her compensable injury of September 21, 2000, Plaintiff remains totally disabled. The medical evidence reveals that (a) Plaintiff is physically, as a consequence of the work related injury, unable to return to her pre-injury employment; (b) Plaintiff has been released to return to work with restrictions of no lifting, and limited pulling, pushing, walking, standing, squatting, kneeling, bending and use of her lower extremities; (c) Plaintiff needs vocational assistance to help her locate suitable employment due to her physical limitations related to her compensable injury; and (d) Plaintiff takes prescribed medications for chronic leg pain.
34. According to Plaintiff's testimony, which the Full Commission finds credible, Plaintiff can stand for short periods of time, she is not steady on her feet and her coordination is off. Plaintiff described a short period of time as fifteen minutes on a bad day and thirty minutes on a good day. The reports from the Carolina Back Institute pain management program are consistent with Plaintiff's testimony in regards to her ability and physical capabilities.
35. Considering her severe physical limitations due to her injury, her limited education and training which qualifies her for work in upholstery, cosmetology, and CNA work all of which she probably can not perform, Plaintiff needs vocational assistance and perhaps retraining to help her locate suitable employment. Plaintiff remains totally disabled and has not refused vocational assistance offered by Defendants.
36. Plaintiff's average weekly wage is $547.71, yielding a compensation rate of $365.15.
37. The treatment provided to Plaintiff was reasonably required to effect a cure, provide relief or lessen her disability resulting from her September 21, 2000 work-related injury.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident to her back, chest and legs on September 21, 2000, and suffers from chronic leg pain as a result of the accident. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is currently disabled as a result of her compensable injuries. The medical evidence reveals that as a result of her compensable injury, (a) Plaintiff is medically unable to return to her pre-injury employment; (b) Plaintiff has work restrictions of no lifting, and restrictions on pulling, pushing, walking, standing, squatting, kneeling, bending and use of her lower extremities; (c) Plaintiff needs vocational assistance to help her locate suitable employment due to her physical limitations related to her compensable injury; and (d) Plaintiff takes prescribed medications for chronic leg pain. Although Plaintiff may be able to do some work, she must have vocational assistance to help her locate suitable employment considering her severe physical limitations due to her compensable injury and her limited education and training. Plaintiff has not refused vocational assistance offered by Defendants.
3. Plaintiff's average weekly wage is $547.71, yielding a compensation rate of $365.15. N.C. Gen. Stat. § 97-2(5).
4. As a result of her chronic leg pain caused by her injury by accident of September 21, 2000, Plaintiff has been temporarily totally disabled from September 21, 2000 through the date of hearing before the Deputy Commissioner and continuing and is entitled to temporary total disability compensation during said period. N.C. Gen. Stat. §§ 97-2(9); 97-29.
5. Defendants are obligated to pay for all of Plaintiff's reasonably required medical treatment resulting from her back and chronic leg pain of September 21, 2000, including past and future treatment, and vocational rehabilitation assistance for so long as such treatment is reasonably required to effect a cure, provide relief and/or lessen her disability. N.C. Gen. Stat. §§97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $365.15 from September 21, 2000, and continuing until further order of the Industrial Commission. Any compensation that has accrued shall be paid to Plaintiff in one lump sum. Defendant is given a credit for compensation already paid to Plaintiff.
2. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff for reasonably necessary treatment related to her compensable injury of September 21, 2000, when bills for the same have been submitted and approved through procedures adopted by the Industrial Commission, for so long as such treatment tends to effect a cure, give relief or lessen Plaintiff's disability.
3. An attorney fee of twenty-five percent of the compensation awarded Plaintiff in paragraph 1 is approved for Plaintiff's attorney and shall be paid as follows: twenty-five percent of the accrued compensation due Plaintiff shall be deducted and paid directly to Plaintiff's attorney; thereafter Plaintiff's attorney shall receive every fourth check from the compensation due Plaintiff.
4. Defendants shall pay the costs.
This the __ day of March 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN